Good morning, and may it please the Court, I'm Jenny Alexander of the United States. I'd like to reserve three minutes for rebuttal. The defendant has failed to show that he has a reasonable expectation of privacy and sprints business records of the cellular towers that denoted the defendant's cellular phone calls. In any event, the government obtained a warrant for those spring records and relied on that warrant in good faith. I'll start by explaining why the Fourth Amendment did not require the government to get a warrant. The Supreme Court's decisions in United States v. Miller and Smith v. Maryland, as well as this Court's decision in United States v. Forrester, established that the defendant had no reasonable expectation of privacy in the spring records here. The defendant entered into a business relationship with Sprint, where the defendant paid Sprint in exchange for cellular phone service. In order to receive that service, the defendant had to connect his cell phone to Sprint's network of cellular towers. Counsel, the technology is morphing rapidly. What happens when Sprint is able to pinpoint a precise location? Well, as you're on our news, there's no evidence that that's the case. I am there. I'm asking you all the questions. Yes, but hypothetically speaking, the Supreme Court has already addressed a similar issue in Smith v. Maryland when it addressed whether the Fourth Amendment required a warrant for pan-registered information. Pan-registered information is not the same as somebody being able to abstract your airframe movement. So if we knew by GPS data exactly where you were at every moment of your life, or at least where your phone was at every moment of your life, that would represent different cases that were problematic for the government. Because even though Sprint was still tracking it, same thing, pan-register principle applies. In Smith, the Supreme Court actually discussed how the pan-registered information in that case revealed that the defendant was in his home when he made phone calls. From the defendant's piece in the opening sentence stationary, what was the advantage of having a plan was when your kids told you, you knew where they were. Today, we don't know where they are with the close or free calling. So I don't know if the pan-register is really applicable to the GPS information Again, it will tell us where every movement for 24 hours a day, at least where your phone is for 24 hours a day. Under the third-party doctrine, which says that information that you voluntarily convey to a third party is not subject to a reasonable expectation of privacy, the granularity and the precision of the information doesn't necessarily matter. Another thing that I'm picking up on where Judge Biden left off, the difficulty I have with Smith is that we do look at the nature of what's voluntarily conveyed. And there, it was voluntarily conveyed. I have this physical planted phone number, and I'm calling over here to that phone number. But you don't even know what information is being conveyed when you're driving around on your cell phone. You don't know where those cell phone towers are. You don't know how close they are. You don't know the precision with which someone can or can't track you. Given the differences in what's happened in the digital world, how can you say that this information is voluntarily conveyed? In order to get cellular phone service, you know that you have to connect to your phone to the cellular network's towers. And you know that you have to be in a range of those towers to get service. So if a phone user is familiar, for example, with a cell phone user, knows that if he or she is out of range of a tower, he won't be able to make or receive phone calls. What is the right thing to do to cycle the content of the calls? Well, content is a very different question. Why would it be different if it's just part of the third-party government? If you're voluntarily conveying, it's more than asking them to the van to their tower to call. It's more calling. It doesn't seem to fully apply. This court recognized in Forrester that the analysis of routing information that a provider needs to convey a communication is potentially analytically different from the contents of that communication. And so in Forrester, this court concluded that two prime e-mail addresses or the IP addresses of the websites you visit are routing information that is not subject to a reasonable expectation of privacy. But the court reserved whether there would be a reasonable expectation of privacy in the messages or the granular substance of the websites that you visit. Back to your earlier answer, you didn't really get to the pinpoint aspect of my question. Obviously, we're going to maybe assume that a reasonable user of a phone knows that the phone signals need to be conveyed in some way. But knowing that doesn't necessarily mean that you know the precision with which one can be tracked. I mean, in later years, it may be that they could track as, like, the Find My iPhone right to this courtroom. But even assuming we don't have that degree of specificity now, what is it that the cell phone user is voluntarily submitting to? The phone user is voluntarily making their phone available to the network. The network can route calls to the phone. I mean, frankly, the benefit that cell phones provide to people is the ability to receive. Well, what do they voluntarily consent to? Is it in the terms and conditions, for example, of your cell phone contract? Well, so Sprint at the time of this case did have a privacy policy in terms of service that both addressed this issue. So the Sprint privacy policy told users that information we collect when we provide you with services includes information about where your device is located. I'm paraphrasing a little bit, but that's in our brief on page 31, footnote 9. Sprint's terms and conditions during the relevant period also said that, as we provide telecommunications products and services to you, we develop information about the location and destination of telecommunications products and services you use. Our networks generally know the location of your device when it is outdoors or turned on. I'm going to assume that I put my phone in your car and we track it. So this method, would that be protected? If you did, would I have an interest in your cell phone records? I'm not sure. Could you object to my phone being in your car and that they track my phone? I think you can object either, but certainly it would be even one step further removed for somebody who is with a cell phone user. I assume that's because of the law dealing with pen register. And you do give up certain things when you give them to somebody else, but if it's my phone, you haven't given anything away. Well, I think I'm going to try to make sure I'm following up on this question. So if you are with a person who has voluntarily conveyed their cell site location information to their cellular provider, that person has no expectation of privacy in that information that they conveyed. If you are with that person, you are, I think, voluntarily with that person, and you have essentially conveyed your location to the person that you are with, and they have conveyed their location to the provider. So to the extent that it's possible to draw inferences from the cell site records and the fact that you are with your friend about where, in a general matter, you might be, those inferences are fair to draw, and they do not intrude on your, like I've had a flashback, whether it was you or me, it was you and me, and I've always been the passenger in the car who would not have a reasonable expectation of privacy in that. One of the odd things here is we don't even have the records at issue. They're talked about and they're described, but am I correct that we don't actually have the cell phone records or the information about the location in the records? That's correct, Your Honor. That's a little odd on both sides. Well, Your Honor, we provided them to the defendant. We are happy to provide them to the court if the court is interested. The defendant did have the burden here of establishing a reasonable expectation of privacy in these records, but if the court is interested, the government can provide those. I can't make a record. Are you saying that the only thing that was at issue was actually calls made and calls received? That's correct. But the cell phone would also be tracking where it's going in between calls made and received, correct, or calls unanswered, that sort of thing? The records we have from Sprint in this case are only for the calls made and received. Whether Sprint could have potentially collected more information about its user is potentially an open question, but the only records that the government is seeking to introduce here are the records associated with calls. And those calls, the connections and cell site information for those calls reflect essentially a two-party interaction between the defendant and Sprint. The defendant made his cell phone, connected it to Sprint's cellular network, and in return he expected to get a phone service, and Sprint provided that service, he expected. And it decided on its own to create records of those connections. The fact that Sprint did that was an independent decision that the government was not involved in, and the defendant had no possessory or ownership interest in those records. Because I do want to reserve a little time for rebuttal. I want to talk quickly about the warrant and good faith arguments as well, but I want to make sure that I answer the Court's questions on this issue too. Just quickly turning to the warrant. The magistrate judge had a substantial basis for finding probable cause because the affidavit established a reasonable nexus between Snead's murder and the defendant's phone records. Specifically, the affidavit established that the family had targeted Snead because of his relationship with the defendant's minor sister, and this family-based attack involved more than one person. Based on the affidavit, it was reasonable to conclude that the defendant was that other person for several reasons. The affidavit established that the defendant had been living with his sister in Los Angeles when she began her relationship with Snead, and the defendant was therefore the obvious link between his sister's life in Los Angeles with Snead and the family of the defendant. There's no discussion of any of that. I mean, there's no discussion of what the family structure was. There was a younger brother. Some questions whether the other person in the car was a female, so it might have been a mother. I mean, this warrant sort of lacked quite a bit. Well, I'd like to suggest a couple of confirmances that a magistrate judge can reasonably draw from this, from the facts presented. The first is that because the defendant is the person who had been part of his sister's life in Los Angeles, he was probably in the best position to identify. Absolutely. Those are also facts. All of that's true. This hasn't been in the warrant. That would have been wonderful for your government, but it wasn't. I appreciate you explaining all of the reasons why a warrant might have been issued here properly, but all the facts are cited were not in the warrant. Well, these are inferences that the magistrate could draw from the facts that are in the warrant. And I would like to point to one more fact that is in the warrant that we can sort of start briefing, which is that immediately before the murder, the defendant's sister told her mother that she was returning to Los Angeles and she was doing that evidently. But after the murder, the defendant's sister told the police that she wanted to stay with her aunt in Vallejo. So she was choosing to change her plans to return to Los Angeles, where she lived with the defendant, in favor of being with the aunt in Vallejo. And the intervening event was Snead's murder, and that suggested that the sister had some belief that the defendant himself may have been involved. But even if this court just doubts about whether the affidavit established probable cause, the good faith exception would still apply, because the affidavit presented a colorable argument for probable cause. It was, therefore, objectively reasonable for the officer in this case to submit the affidavit to the magistrate judge and to rely on the magistrate judge's ruling with the affidavit to tell the probable cause. I'd like to reserve my remaining time for rebuttal. Thank you. Good morning, Your Honors. May it please the Court. Nathan Frequistler of the ACLU, on behalf of TAMIKI. I'm trying to let Mr. Hilton's counsel, Mr. Goldrosen, if I will take ten minutes and address the question under the Fourth Amendment of whether the warrant requirement applies to collection of historical self-replication records. Mr. Goldrosen will take the remaining five minutes and address the questions of whether the warrant here was actually kind of an unprobable cause, and if not, whether the good faith exception applies. This case presents the Court with the pressing question of whether the warrant clause of the Fourth Amendment is to maintain its vitality in the digital age. Here, the government violated Mr. Hilton's reasonable expectation of privacy under the Fourth Amendment when it collected nearly 9,000 data points of dislocation and movements over a 37-day period without a valid search warrant. A person's privacy interest in this information is not vitiated merely because his wireless carrier had access to that information, and because no exception to the warrant requirement applies, a warrant was acquired here. Thank you. And, of course, it's been quite some time here at the ACLU, and we have seemed to be divided in our circuits. There's cases in the 11th and 11th District. There's two cases there. There's one earlier case that went the other way, and all the other district courts that have been on the other floor have all gone the other way in this case, so this one is somewhat different. There seems to be a swelling against your position, but certainly that's true in the appellate courts, where four appellate courts have all gone the opposite way, the Fourth Circuit being, I think, perhaps the strongest case. In our circuit, we have held that we don't create a circuit split unless there's a compelling reason to do so, and it puts the burden upon you to see why this is compelling, when the majority of the district courts have gone against you, when all of the court appeals have gone against you, and where we take the position that unless there's a compelling position, we're not going to create an inter-circuit split. Now, why is this case going to be able to be that exception? I think this is absolutely compelling, Your Honor. I will note that the four other circuits that have ruled have been ridden by disagreement between judges. There are 18 separate majority-conferring dissenting opinions. A wide range of views on this have been aired, and very strongly on both sides of the issue. The question here is whether the government should be allowed to collect long-term, pervasive, relatively precise location information about a person as they move about their daily lives, and to obtain it without a warrant, creating a virtual time machine allowing them to go back in time and trace somebody's comings and goings, their time at home or away where they sleep, and there's so much information. One of the penalties is to put all that information away. If you send materials into the bank, you give them to a third party. I think people would be shocked. I don't think you just go in and get those. There are, just because it starts out as someone thinking this is private, it doesn't make it public. Your Honor, the third-party doctrine cases from the Supreme Court, Miller and Smith, do not hold, as this Court has recognized before us during Holden Valley, do not hold that as a categorical matter, any record held by a third party is exempt from the Fourth Amendment's warrant requirement. That's right. There are two dimensions to the analysis. First, whether the information was voluntarily conveyed, and second, the nature of the information, how private or how sensitive it is. And I think, you know, a balancing or a sliding scale, and this Court has recognized before us, sir, that the contents of records, including the contents of emails voluntarily conveyed to a service provider, likely remain protected by the warrant requirement. The Sixth Circuit has helped us fairly in the Warshak case. But we have no content here. Is that correct? That's right. We don't have the contents of the phone calls. I do think, though, that this kind of pervasive long-term location information is closely analogous to content information in the very detailed picture of a person's life that it paints. You could tell, based on our own analysis of the records, and I understand that the phone records are not before this Court, but that's if the Court thinks that it needs to see it. It's odd to me. I take it that it only is recording calls made and calls received. Correct? That's right. These records, as of 2012, in the state of technology, as Mr. Cliby, you know, that you were asking earlier, is changing, and cell phone companies now are recording much more. But as of these records, at least in 2012, it was for outgoing and incoming calls. But based on Amiki's analysis of the records, that included more than 100 incoming calls that were answered and that went to voicemail, which bears very directly on the voluntariness factor. Not only is it incoming calls where Mr. Gilson wasn't taking any action, but even calls that he perhaps didn't see, he certainly didn't answer, still resulting in a location record available to the government here. Okay, so all this information is given out by billionaires who find out everybody you've called. You get an awful lot of information. Clearly, though, the courts have said that's okay. There is information that you give out that isn't protected. And location was part of them. Location where calls are going to that you make. Location of your phone was certainly indicated by the time of registration. It was who you were calling. That's right, and that's an inherent feature of the landline, which stems from the fact that the user of the landline voluntarily provides their address to the phone company in order to set up that line and then dials those phone numbers in order to connect to whoever they call. They don't voluntarily give up who they're calling. I think the pen writer's cases are very strong against the elements of shielding. How would consumers think? Aside from their pen dresses and their phones, and this is a cell phone, but certainly that won't affect them. I want to find some rationale between the two. Well, your Honor, I think they're distinguishable on both prongs of the third-party doctrine test, both voluntariness and sensitivity of the information. On voluntariness, the pen register recorded the phone numbers that you at that point put into a rotary phone now that you've put into your cell phone and click send. Voluntarily conveying those numbers to the phone company because they're necessary to connect that call. Cell phone location records are not conveyed to the phone company. You're not inputting your location. In fact, there's no way for a user to know what location information user is not being recorded. There's not even a way for a user to obtain their location records inside a cell. I don't think the person has a pen register any more than a person knows that these people get some information of where the cell phone tower is. But in cases where these pen registers, there's some very damaging information, you're calling conspirators, and if they were tracking criminal activity formally pervasive, then it seems to me that's the case. Your Honor, the fundamental question before this court is how far to read Smith and the other third-party doctrine cases. The Supreme Court has strongly cautioned courts not to overread the digital precedents applied to newer, pervasive, or very sensitive digital records. And that was certainly true in Riley about searches of cell phones to arrest. This court in Cotterman took the same lesson about searches of cell phones under the border search extension. As the Supreme Court explained as far back as Hilo about thermal imaging devices, courts did not assume and apply by rote to read digital precedents to these newer, more pervasive, more sensitive, and more unavoidable records. But can the phone user disable the GPS or the function? The phone user can disable the location tracking function as it applies to third-party applications on your phone, like Google Maps, for example. But turning off location services has absolutely no effect on whether the phone company can determine the location of that phone, record it, and provide it to the government. And in fact, that I think strongly bears on the voluntariness practice because it's affirmatively misleading to customers. I also wanted to follow up. Well, let me just go back, though. If you've disabled all locational applications and your phone is on, in effect, the airplane mode, plus you've disabled all these others, and someone calls you but you don't answer, does the record show whether the phone company can pinpoint your location? If the phone is truly in airplane mode, meaning that all of its radio transmitters and receivers are turned off, then no, my understanding is that the phone is not being used. And, I mean, one of the questions is, why should I be sad with all the people who are calling me, all these third-party solicitors, plus anyone else that calls me that would think I want to call me? So if I don't want anyone to call me and I don't want anyone to know where I am, you simply voluntarily put the phone in airplane mode. That then leaves you, if you want to make a phone call, however, you must be able to be in a transmission mode, correct? That's right. You have to go out of airplane mode and turn it on. I don't think that phone users should be required to disable the core functionality of their phone in order to avoid this kind of background awareness surveillance. I see that we're at five minutes remaining, and I want to leave time for Mr. Goldrose. Thank you, Your Honors. Good morning, Your Honors. I am Mark Goldrose, attorney for Antonio Clifton. And may it please the Court, I'm going to address the adequacy for warrant that was issued in this particular case. I think the government's primary argument, at least in their briefing, was that the district court judge applied an incorrect standard in evaluating whether the affidavit in support of the warrant established probable cause. According to the government's argument, the district court asked the question of whether there was probable cause to believe that Antonio Clifton was involved in the homicide rather than ask the question of whether there was probable cause to believe that there was evidence related to the murder in the information being sought, that being the cell site location data. I think the government is mistaken in its criticism of the district court. If you look at the district court's order in page 5, the district court laid out all the appropriate standards for determining whether a warrant establishes probable cause. The court articulated the issue as whether there's a fair probability that a contraband or evidence of a crime will be found in a particular place, and then went on to explain that this is a decision based on reasonableness. And the reviewing court will find that a warrant is unsupported by probable cause when the issue being judged lacked a substantial basis for concluding that probable cause existed. It is correct that when the district court went on to analyze the facts that were contained in the other data, it did emphasize the lack of any connection between Antonio Clifton and the murder that was being investigated. But that was not because the district court was applying the wrong standard. It's because the two questions, whether Mr. Dalton was linked to the homicide and whether there was evidence related to that homicide in its cell site location data, are closely entwined. We can't have one without the other. What's the standard review? It should have been given by the district court to the magistrate judge. In clear error. And we know that could not have been true. How is it clear error? It was clear error because there was simply nothing in this affidavit that could have given all the differences that was occurring around it. Yes. And that's because if you look carefully at the affidavit, you have three and only three references to Antonio Clifton in that entire affidavit. And each one of those references is entirely innocuous. One reference was that Antonio Clifton was the minor, as she described him, elder brother. A second reference was that not that she had been living with him since the time of their relationship, as everyone argued before. But simply she said, according to the affidavit, she was then staying with Antonio Clifton, not that she had been living with him since the beginning of the relationship. And third, that Antonio Clifton's cell phone number, along with that of her father, her mother, and a younger brother, were all listed in her. I have these arguments. We give all these answers because these are lawyers making them. So we have time afterwards to read and dissect the moving cases. And so we have a clear air that we require. You're holding them to a pretty high standard. I don't see where you put clear air into beating the issue. And we have to do that, because it's the only way we confront them. We can't send all police officers to law school who can come in there and argue, look, marvelous way you have hit her. So what about clear air? Clear air means something different from hair. So I disagree with your position here in that I think that with this minimal amount of evidence, do you think giving all deference to the decision to be honoring people, the magistrate has created clear air? That is correct. So if they've gone through one thing, if they've actually gone and gotten a warrant, if they even got it from a police, from a magistrate, but it's clear air, whatever. That is correct. I think that if this warrant were to be upheld as under a South Sea Probable Clause, even allowing every state man exception, there would not be any warrant that would not be proper. If you compare this case to the Grant case, in which this court, the Ninth Circuit, just a few years ago, found that the warrant was not only making probable cause, but the exception for which they did not apply. The court wrote that the affidavit simply did not set up any plausible connection between the home that was to be searched and the evidence that was being looked for by the police. And that's the precise scenario we have here. There is no plausible connection between the killing of Mr. Steed and anything that would be in Mr. Antonio Celtic's South Side location. I have a question for you with respect to stored communications. Because there haven't been too many of these cases, and there hasn't been a lot of law on this relationship between the probable cause and the Fourth Amendment and whether somehow Congress can bypass that through something like the Stored Communications Act. But the government's reason, as I read it, is to some degree invoking the Stored Communications Act in conjunction with the good faith. And I know you disagree with that, but I want to understand why. Well, I think the problem with that argument is that they are saying that the police relied upon the lesser standard of reasonable grounds that's set forth in the Stored Communication Act, which sets forth two possible ways to obtain this information out of the probable cause of the warrant or reasonable grounds in the court order. I think the government would be in a good position if, in this particular case, the police actually were forced to apply the Stored Communication Act inside the court order based on reasonable grounds. But they didn't. On that point, when we're looking backwards with Leon, who are always in a situation where now we're looking at that officer, but we're looking in some objective sense. So what is your best support that we should look at the particular officer when you're looking at the standards such as a lesser standard of the Stored Communication Act? Well, I think the best argument is, again, that you have to look at what the officers actually relied upon. For example, if you compare it to the Leon scenario, if the officers, it was not entirely unreasonable, but Leon tells us it's not entirely unreasonable for the officers to have relied on a warrant that they saw, even though that warrant did not establish probable cause, you don't have a suppression remedy. But how can you excuse the police using a warrant that doesn't establish probable cause and is entirely unreasonable with respect to probable cause based upon a statute that we don't even know these officers knew existed? Certainly, they didn't rely upon it. We've seen cases where the federal judges have found that they do advance reliance when the federal agents have relied on the lesser standard 2703D. But the courts have then found they need to go with probable cause. The courts have said, well, you can rely on a statute that exists at the time. But those are all cases in which there was actual reliance. That is not what happened here. The police claimed a probable cause when they certainly didn't. In fact, it was entirely unreasonable. They came with additional probable cause. Thank you. That was a great bundle of time. Thank you, Your Honors. I have three points I'd like to make about the reasonable expectation of privacy issue. But first, I would just quickly like to address this court communications issue that you raised, Judge McEwen. The court in this case, the state court, is empowered to issue court orders under ADEOC 2703D. And by finding that the warrant here established probable cause, the magistrate judge necessarily found that it also established that it also satisfied the lesser standard of a 2703D order. So the fact that the officers may not have had subjectively 2703D in their minds doesn't preclude the court from finding that this warrant was effectively a valid 2703D order. To turn back to the reasonable expectation of privacy issue, I wanted to just make three quick points. The first is that Amiki referred to this as the government collecting information. And that's just not accurate. What happened here is Sprint is collecting information about its business interactions with its customers. Sprint chooses what information to collect and maintain. And the government has nothing to do with that process. To the extent that the defendant and Amiki are concerned about Sprint's collection and retention of data that concerns them, Sprint might start retaining more data in the future, and that data might be more granular. That concern is an issue with the provider and something that could potentially be addressed legislatively. But it doesn't involve government action that implicates a Fourth Amendment. Second, the third party documents established by the Supreme Court and Miller and Smith does not take into consideration the privacy or sensitivity of the information that someone conveys voluntarily to a third party. So we now have one of the few areas where we have strong privacy laws is in the medical area. If I were to take you back before HIPAA, before those laws, is it your position that under the third party doctrine that a patient conveying medical information to an insurance company or others would have no privacy expectation because it's conveyed to a third party? Again, I think that's a very difficult question, Your Honor. And there are privileges involved in that relationship that are not presented in the business relationship here. So I think we're far afield here from what that type of situation would be. Because here we really are just dealing with the routing information. Is there any limit to the third party doctrine? That's really what this question is asking. Because once you turn it over to a third party, if we read your interpretation of the court's cases, it's a free-for-all at that point. So it would seem that there's no end point to the third party doctrine. Frankly, Your Honor, I have not seen something in Supreme Court jurisprudence to suggest that there is some kind of sensitivity and exception to the third party doctrine. I'm not going to say that the Supreme Court, if faced with that issue, wouldn't reach that conclusion. But for example, you don't have a reasonable expectation of privacy in, for example, a confession to murder that you might make to an acquaintance. If the acquaintance provides that extremely sensitive and very incriminating information with government, you cannot say that you've had a reasonable expectation of privacy, even though that information was about as bad as it can get in terms of its implications for you in a criminal case. I do have one more point I wanted to make, but I know that I'm over time. So the one question on the voluntariness, when you're using a cell phone, the user knows where they are. And they know that the cell phone provider is finding them when they route calls to the cell phone or when they route calls from the cell phone. They know that the cell phone provider is able to somehow determine their location. So they may not understand the technical capabilities of how the cell phone provider does that, but they know that they are doing something that makes the cell phone provider able to find their phone in the world. Thank you. I'd like to thank all the panelists for both for the briefing and for the very good arguments this morning. The case of the United States v. Hilton is submitted.
judges: Wallace, McKeown, Bybee